**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 917-463-1044
Email: jalieberman@pomlaw.com
Email: bszydlo@pomlaw.com

*Counsel forLead Plaintiff and*
*the Proposed Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WILLIAM LIKAS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHINACACHE INTERNATIONAL HOLDINGS LTD., SONG WANG, GUANGSHENG MENG, FENGYE GAO, and JING AN,<br><br>Defendants. | No.: 2:19-cv-06942-FMO-SS<br><br>**AMENDED COMPLAINT** |

The ChinaCache Investor Group, the Court-appointed Lead Plaintiff consisting of Plaintiffs Jingwen Zhang and Bingyang Cheng ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by Lead Plaintiff, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by ChinaCache International Holdings Ltd. ("ChinaCache" or the "Company"), securities analyst research reports, press releases, and other public statements issued by, or about, the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired ChinaCache securities between April 10, 2015 and May 17, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. ChinaCache was founded in 1998 and is headquartered in Beijing, the People's Republic of China ("China" or "PRC"). ChinaCache's American depositary receipts ("ADRs") traded on the NASDAQ under the ticker symbol "CCIH" until it was delisted in the fall of 2019. It now trades under the ticker symbol "CCIHY" in the over-the-counter market.

3. ChinaCache is an investment holding company that, through its subsidiaries and consolidated variable interest entities in China, purports to offer a portfolio of services and solutions to businesses, government agencies, and other enterprises to enhance the reliability and scalability of their online services and applications.

4. The Company derives revenue from three primary business segments – the delivery of content delivery network services, internet data center services, and internet exchange platform services.

5. Throughout the Class Period, Defendants made materially false and/or misleading statements and/or failed to disclose that ChinaCache and Defendant Song Wang ("Wang")—the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Chairman")—were involved in a bribery scandal. The foregoing conduct placed ChinaCache and Wang at a heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations. This resulted in the criminal

investigations of Wang and the Company, the arrest of Wang, and the indictment of the Company in China.

6. Wang and the Company's corruption cases for bribery are the result of bribes paid to Gao Shouliang ("Gao"), the Secretary of the Chinese Communist Party and Secretary-General of the Beijing Federation of Supply and Marketing Cooperatives ("BFSMC"), a governmental group in Beijing partially under the leadership of the Beijing Municipal People's Government.

7. The bribes were facilitated by a ChinaCache employee under Wang in connection with the 2014 Sale/Leaseback Deal (defined herein) with the BFSMC regarding buildings in the Company's Internet Data Center (defined herein).

8. On April 11, 2019, ChinaCache reported that Grant Thornton China, the Company's auditor, had resigned on April 8, 2019.

9. On March 21, 2019, the Beijing People's Procuratorate issued a warrant for Gao's arrest on charges of receiving bribes, corruption and possessing large amounts of assets of unknown origin, and on May 15, 2019, the Procuratorate filed formal charges against Gao.

10. Two days later, on May 17, 2019, ChinaCache issued a press release announcing that both Wang and the Company were currently the subjects of a criminal investigation by a government prosecutor office in Beijing for allegations

of enterprise bribery. ChinaCache also disclosed that Wang was arrested and had resigned as CEO.

11. On this news, ChinaCache's ADR price fell $0.22 per share, or 20%, to $0.88 per share on May 17, 2019 before NASDAQ halted trading in ChinaCache ADRs at 11:12 a.m. Eastern Time.

12. Five days later, on May 23, 2019, ChinaCache disclosed receipt of a NASDAQ Notification Letter (the "NASDAQ Letter") concerning the Company's failure to comply with the NASDAQ listing requirements, citing the Company's delay in filing its Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2018 (the "2018 20-F").

13. The NASDAQ Letter also posed several questions to the Company regarding the resignation of Grant Thornton China, ChinaCache's engagement of Michael T. Studer CPA P.C. ("Studer") as the Company's new auditor, and the allegations of enterprise bribery against Wang and the Company. According to the NASDAQ Letter, ChinaCache was required to submit its plan to regain compliance with NASDAQ listing requirements, as well as to provide its responses to the NASDAQ Letter's questions, no later than May 31, 2019.

14. One week later, on May 31, 2019, ChinaCache disclosed that it had terminated Studer as the Company's auditor and that the timing of the Company's

new auditor's appointment was dependent on the status of its ongoing investigation.

15. On June 6, 2019, ChinaCache issued a press release announcing Wang's resignation from the Company's Board of Directors.

16. On July 22, 2019, ChinaCache received a temporary stay of delisting from the NASDAQ pending a hearing scheduled for August 22, 2019 and a final determination regarding the Company's listing status after the hearing.

17. On August 28, 2019, the Company disclosed in a press release that ***Wang's arrest for enterprise bribery actually occurred on or about January 16, 2019, and that after his arrest in January, the Company's operations were managed by other members of the Company's management team.***

18. ChinaCache further disclosed that a special committee comprised of independent members of the Company's Board of Directors (the "Special Committee") hired Simpson Thacher & Bartlet LLP to assist in conducting an investigation into the circumstances surrounding Wang's arrest and allegations of enterprise bribery involving the Company that date back to 2014. The Special Committee ***"identified potential concerns relating to certain Company transactions that may indicate that improper payments were made in connection with the 2014 transaction at issue"*** (emphasis added). Although the Company failed to define the "2014 transaction at issue," it was a reference to the 2014

Sale/Leaseback Deal between ChinaCache and the BFSMC with respect to buildings in the Company's Internet Data Center.

19. On September 6, 2019, ChinaCache's ADRs began to trade in the OTC market instead of on the NASDAQ. Since trading had previously been halted on the NASDAQ less than two hours after the Company's May 17, 2020 press release, the market continued to react to the press release. Additionally, the market was reacting to the events that occurred since trading was halted, including the May 23, 2019 NASDAQ letter; the May 31, 2019 announcement that that the Company fired its auditor who had just recently replaced Grant Thornton China; and the Company's June 6, 2019 announcement that Wang resigned from the Board. The news that the Company's ADRs were trading in the OTC market instead of on the NASDAQ also signaled to the market that the temporary stay of delisting from the NASDAQ announced by the Company in its August 5, 2019 press release, was likely lifted.

20. On this news, the Company's ADR price fell $0.48 per share, or approximately 55%, to close at $.40 per share on September 6, 2019.

21. On September 9, 2019, the Company announced final delisting from the NASDAQ and that the Company did not intend to appeal the decision.

22. On this news, ChinaCache's ADR price fell $0.36 per share over a three-day period, or 90%, to close at $0.04 per share on September 11, 2019.

23. Just 10 days later, on September 19, 2019, ChinaCache issued a press release announcing that ***the Company had been indicted for Company bribery***. The press release stated that the First Branch of Beijing People's Procurator presented public prosecution to the First Intermediate People's Court of Beijing against the Company regarding the case of suspected Company bribery.

24. On December 31, 2019, the Beijing First Intermediate People's Court ruled that certain agreements relating to the 2014 Sale/Leaseback Deal were null and void, including a December 31, 2014 Cooperation Agreement, signed by Wang and Gao providing for the sale of Building 7. The court stated (emphasis added): ***"Investigation has found that the parties signing the Cooperation Agreement . . . engaged in malicious collusion and harmed collective interests, and [the contracts] should be declared void."***

25. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

26. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

28. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as Defendants conduct business in this District and have an office in this District.

29. In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## I. PARTIES

30. The ChinaCache Investor Group, the Court-appointed Lead Plaintiff consisting of Plaintiffs Jingwen Zhang and Bingyang Cheng, acquired ChinaCache securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

31. Defendant ChinaCache is organized under the laws of the Cayman Islands, with principal executive offices located at Section A, Building 3, Dian Tong Creative Square, No. 7 Jiuxianqiao North Road, Chaoyang District, Beijing, 100015, China. ChinaCache ADRs traded on the NASDAQ under the ticker symbol “CCIH” and later on the over-the-counter (“OTC”) market in the United States under the ticker symbol “CCIHY”.

32. Defendant Wang served as ChinaCache's Founder, Chairman, and CEO at all relevant times.

33. Defendant Jing An ("An") served as ChinaCache's Chief Financial Officer ("CFO") from August 19, 2014 until July 1, 2016. Before ChinaCache appointed Defendant An as CFO, she served as the Company's acting CFO and Vice President of Finance since March 2013.

34. Defendant Fengye Gao ("Fengye"), ChinaCache's Financial Controller, assumed the responsibilities of the Company's principal financial and accounting officer on September 6, 2017, on the same date that Naijiang Zhou, who had served as interim CFO from September 1, 2016 to September 6, 2017, resigned as interim CFO. Defendant Fengye served in this capacity while the Company searched for a permanent CFO.

35. Defendant Guangsheng Meng ("Meng") served as ChinaCache's CFO from April 20, 2018 until he resigned in August 2018.

36. The Defendants referenced above in ¶¶ 32-35 are sometimes referred to herein collectively as the "Individual Defendants."

37. The Individual Defendants possessed the power and authority to control the contents of ChinaCache's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of ChinaCache's SEC filings and press releases alleged herein to be misleading prior

to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with ChinaCache, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## II. SUBSTANTIVE ALLEGATIONS

### A. Background

38. ChinaCache was founded in 1998 and is headquartered in Beijing, China. ChinaCache is an investment holding company that, through its subsidiaries and consolidated variable interest entities in China, purports to offer a portfolio of services and solutions to businesses, government agencies, and other enterprises to enhance the reliability and scalability of their online services and applications.

39. The Company derives revenue from three primary business segments – the delivery of content delivery network ("CDN") services, internet data center ("IDC") services, and internet exchange platform ("IX") services.

40. CDN is a content distribution network built on the network. IDC services provide cabinet rental and bandwidth service to customers. IX services allow networks to interconnect directly, via the exchange, rather than through one or more third-party networks.

41. IDC services are a significant part of ChinaCache's business. Even before its Internet Data Center (defined below) was fully operational, one analyst in March 2015 stated that the IDC business "could be the major catalyst for the stock." In August 2015, that same analyst stated: "the company valuation has upside potential from growth levers in their IDC business" and "[w]e expect ChinaCache's IDC business to contribute RMB 250m in 2016, which will account for ~17% of total revenue." In December 2015, that same analyst valued ChinaCache's Internet Data Center business at $100m.

**B. The Atecsys International Data Center**

42. ChinaCache's Atecsys International Data Center (the "Internet Data Center"), is located in the Tianzhu Comprehensive Bonded Zone in Beijing, China. The Company's subsidiary, ChinaCache Xin Run Technology (Beijing) Co. Limited ("ChinaCache Xin Run"), operates the Company's Internet Data Center business.

43. The Internet Data Center, the largest carrier-neutral data center campus, is spread across 80,000 square meters. The Internet Data Center

constitutes a total of 10 buildings which include nine data center buildings and one administration center. It provides customized data center products to companies of all sizes, and is rated as a National Class A data center.

44. The creation of the Internet Data Center (discussed below) marked a significant milestone for ChinaCache, as it expanded the Company's cloud services solution beyond its cloud-based CDN platform.

### C. The Construction of the Internet Data Center and ChinaCache's Relationship with the Beijing Federation of Supply and Marketing Cooperatives

45. In 2013, ChinaCache embarked on building a cloud infrastructure in collaboration with its clients, and began constructing the Internet Data Center. On December 4, 2014, ChinaCache announced the completion of the Internet Data Center's core structure.

46. In 2014, the Company reported that ChinaCache entered into agreements with two clients relating to the Internet Data Center. The first phase of construction was expected to be completed by December 2015 for the first batch of customers, including *people.cn* and the BFSMC, a governmental group in Beijing partially under the leadership of the Beijing Municipal People's Government.

47. Pursuant to these 2014 agreements, the two clients agreed to purchase part of the cloud infrastructure from ChinaCache.

48. According to the Company's SEC filings, on December 30, 2014, ChinaCache (defined as the Company, its subsidiaries and its consolidated variable interest entities) entered into agreements with the BFSMC, pursuant to which ChinaCache agreed to sell to the BFSMC one of the Internet Data Center buildings (Building No. 7) proposed to be constructed. ChinaCache Xin Run and the BFSMC signed a Cooperation Agreement, dated December 31, 2014, signed by Defendant Wang and Gao, the Secretary of the Chinese Communist Party and Secretary-General of the BFSMC (the "2014 Cooperation Agreement"). The 2014 Cooperation Agreement provided for the sale of Building 7.

49. Under its 2014 framework agreement with the BFSMC, ChinaCache agreed to sell two additional buildings (Buildings 5 and 6) to Beijing Shixin Hengtai Investment Co. Ltd. ("Shixin Hengtai"), a wholly-owned subsidiary of the BFSMC, through transferring the equity interest of its subsidiary, Beijing Zhaodu Technology Co., Ltd. ("Beijing Zhao Du"), the owner of the buildings. In addition, Beijing Blue I.T. Technologies Co. Ltd. ("Beijing Blue"), a ChinaCache affiliate owned by Defendant Wang and his wife (Kou Xiaohong), agreed to lease back the buildings to be sold upon the completion of the transfer.

50. All of the above agreements are collectively referred to as the "2014 Sale/Leaseback Deal."

51. On January 16, 2015, ChinaCache and the BFSMC held a ceremony to officially launch the project. Among the individuals who attended the ceremony were Defendant Wang and Gao.

52. On December 18, 2015, the BFSMC and ChinaCache held an event announcing a partnership to develop big data services. The partnership reportedly involved the founding of a joint venture called Beijing Supply and Marketing Big Data Group Co. Ltd ("BFSMC Big Data"). The BFSMC Big Data is jointly owned by subsidiaries of the BFSMC and ChinaCache. The keynote speech at the event was given by Gao. He stated: "We have already begun investing in and building the Beijing Shouming, Guiyang Qianming and Chengde Deming big data centers." Media coverage reported that the BFSMC would partner with ChinaCache on all three data centers.

**D. ChinaCache and BFSMC's Relationship Quickly Sours**

53. The relationship between ChinaCache and the BFSMC began to sour by 2016.

54. According to the Company's SEC filings, on May 5, 2016, ChinaCache reached a supplemental agreement with the BFSMC, pursuant to which the parties agreed that September 30, 2015 should be deemed as the date of delivery of the buildings as long as ChinaCache completed the actual delivery as well as the equity transfer by December 31, 2016. If the equity transfer and other

agreed procedures were completed on time, ChinaCache's liabilities would be deemed fully discharged.

55. However, the BFSMC did not accept the buildings by December 31, 2016 due to ChinaCache's disagreement with the BFSMC on the standard of delivery and acceptance of the buildings. Consequently, ChinaCache re-negotiated with the BFSMC and reached a series of new agreements with the BFSMC in July 2017. Pursuant to the new agreements, the BFSMC agreed to make the payments of RMB105.6 million to ChinaCache immediately upon the completion of the equity transfer of Beijing Zhao Du. Although ChinaCache completed the transfer of the equity interest in Beijing Zhao Du and the ownership of the buildings in July 2017, the BFSMC failed to make the payments of RMB105.6 million to ChinaCache as agreed.

56. The two groups have been in litigation with each other regarding the 2014 Sale/Leaseback Deal since the summer of 2017.

**E. Gao is Investigated and Charged with Receiving Bribes, Corruption and Possessing Large Amounts of Assets of Unknown Origin**

57. In September 2018, the Central Commission for Discipline Inspection ("CCDI") and the National Supervisory Commission issued a press release stating that Gao was under investigation for "serious legal and disciplinary violations". The CCDI is the Chinese Communist Party department in charge of enforcing the

party's internal rules, including those related to corruption. The National Supervisory Commission is its state equivalent, but in practice, the two departments have the same office and staff. The phrase "serious legal and disciplinary violations" when used by the CCDI usually denotes some manner of bribery or corruption.

58. On March 13, 2019, Gao was relieved of his party and governmental positions on suspicion of corruption and bribery among other charges, according to a CCDI press release. The press release did not include concrete details, but stated that Gao's case had been transferred to judicial authorities.

59. On March 21, 2019, the Beijing People's Procuratorate (the "Procuratorate") issued a warrant for Gao's arrest on charges of receiving bribes, corruption and possessing large amounts of assets of unknown origin.

60. On May 15, 2019, the Procuratorate filed formal charges against Gao. Media outlet iFeng published details of Gao's case on August 28, 2019. Gao allegedly received bribes worth CNY 180 million (USD 25.6 m), including CNY 10 million (USD 1.4m) through his daughter. He allegedly obtained CNY 1.64 million (USD 234,000) through corruption, and possessed over CNY 20 million (USD 2.85m) in assets of unknown origin.

61. The Company and Wang's corruption cases for bribery are the result of bribes paid to Gao that had been facilitated by a ChinaCache employee under

Wang's direction in connection with the 2014 Sale/Leaseback Deal with the BFSMC regarding the Internet Data Center.

### F. The Company Announces that ChinaCache and Wang Are the Subjects of a Criminal Investigation, and that Wang Was Arrested and Resigned as CEO

62. On May 17, 2019, just two days after Gao was formally charged with receiving bribes, ChinaCache filed a Form 6-K with the SEC with an attached press release announcing that both the Company and Defendant Wang were currently the subjects of a criminal investigation by a government prosecutor office in Beijing for allegations of enterprise bribery. ChinaCache further announced that Wang was arrested and had resigned as CEO.

63. On June 6, 2019, the Company filed a Form 6-K with the SEC with an attached press release announcing the resignation of Defendant Wang from the Company's Board of Directors.

64. ***On August 28, 2019, the Company disclosed that Wang's arrest for enterprise bribery actually occurred on or about January 16, 2019, four months before it was first announced, and that after Wang's arrest in January, the Company's operations were managed by other members of the Company's management team.*** Wang's case is not expected to be over until 2021.

65. On September 19, 2019, the Company filed a Form 6-K with the SEC with an attached press release stating that ***the Company had been indicted for***

***Company bribery***. The press release stated that the First Branch of Beijing People's Procurator has presented public prosecution to the First Intermediate People's Court of Beijing against the Company regarding the case of suspected Company bribery. A Company representative, and the Company counsel, "collected the indictment" on September 9, 2019. The case is in the public prosecution stage.

**G. The Company Is Delisted from the NASDAQ**

66. On April 11, 2019, ChinaCache filed a Form 6-K with the SEC, reporting that, on April 8, 2019, Grant Thornton China, the China member firm of Grant Thornton International, Ltd., had resigned as ChinaCache's auditor (the "April 2019 6-K").

67. Additionally, according to the April 2019 6-K, ChinaCache had engaged Studer as the Company's auditor on April 10, 2019. The April 2019 6-K did not mention what, if any, effect this sudden change in the Company's auditor would have on the Company's upcoming deadline to file the 2018 20-F.

68. On April 29, 2019, eighteen days after ChinaCache reported that it had replaced its auditor, the Company filed a Notification of Late Filing on Form NT 20-F with the SEC revealing that the Company would delay filing the 2018 20-F. According to the Form NT 20-F, ChinaCache was delaying the 2018 20-F's

filing "because U.S. GAAP audited financial statements of the [Company] are not yet available."

69. On May 23, 2019, ChinaCache disclosed receipt of a NASDAQ Letter concerning the Company's failure to comply with the NASDAQ listing requirements, citing the Company's delay in filing the 2018 20-F (the "NASDAQ Letter"). The NASDAQ Letter also posed several questions to the Company regarding the resignation of Grant Thornton China, ChinaCache's engagement of Studer, and the allegations of enterprise bribery against Defendants ChinaCache and Wang. According to the NASDAQ Letter, ChinaCache was required to submit its plan to regain compliance with the NASDAQ listing requirements, as well as to provide its responses to the NASDAQ Letter's questions, no later than May 31, 2019.

70. On May 31, 2019, ChinaCache filed a Form 6-K with the SEC, wherein the Company disclosed that it had "terminated Michael T. Studer CPA P.C. as the Company's independent registered public accounting firm." According to the May 2019 6-K, "[t]he decision was approved by the Company's Audit Committee[,]" and "[t]he Company intends to appoint a new auditor in the near future." The May 2019 6-K also noted that ***"[t]he timing of the [Company's] new auditor's appointment is dependent on the status of its ongoing investigation."*** (Emphasis added.)

71. On July 9, 2019, the Company filed a Form 6-K with the SEC with an attached press release announcing that on July 2, 2019, it received a notification letter from the NASDAQ that its ADRs would be delisted. The notification letter stated that the staff denied the Company's request for an extension of time to regain compliance with the filing requirements in NASDAQ Listing Rule 5250(c)(1) (because it did not timely file its annual report on Form 20-F for the fiscal year ended December 31, 2018). The staff also cited two additional bases for delisting – (i) non-compliance with NASDAQ Listing Rule 52560(b)(1) due to the Company's failure to timely disclose certain information regarding the arrest of the Company's former CEO, Defendant Wang, and the criminal investigation into the Company as well as (ii) public interest concerns pursuant to Nasdaq Listing Rule 5101 due to the failure of the Company's senior management to promptly advise the Board of Wang's arrest and the investigation of the Company.

72. The Company was quick to react stating it would appeal the decision to the NASDAQ Hearings Panel which led to a temporary stay of delisting from the NASDAQ as announced by the Company in its August 5, 2019 press release. The Company appealed the determination to the NASDAQ Hearings Panel which made the final determination in September 2019 to delist the Company's shares.

**H. Findings of the Special Committee's Investigation**

73. On August 28, 2019, the Company filed a Form 6-K with the SEC with an attached press release (the "Press Release"). The Press Release stated that a special committee comprised of independent members of the Company's Board of Directors (the "Special Committee") hired Simpson Thacher & Bartlet LLP to assist in conducting the investigation and that the Special Committee concluded its fact-finding portion of the internal investigation into the circumstances surrounding Wang's arrest and allegations of enterprise bribery involving the Company that date back to 2014.

74. The Company disclosed that ***"the Special Committee identified potential concerns relating to certain Company transactions that may indicate that improper payments were made in connection with the 2014 transaction at issue"*** (emphasis added). Although the Press Release did not identify "the 2014 transaction at issue[,]" it was a reference to the 2014 Sale/Leaseback Deal between ChinaCache and the BFSMC with respect to the buildings at the Internet Data Center. The statement also indicates that more than one "improper payment" was made.

75. The Press Release further stated that the Special Committee "did not identify direct evidence indicating that Mr. Wang or any member of Company Management or the Board of Directors . . . engaged in or approved of any improper

payment[,]" relating to the 2014 transaction at issue, ***but failed to state whether the Special Committee found any indirect evidence of such conduct***. If indirect evidence were lacking, surely the Company would have disclosed this information in the Press Release.

76. The Press Release further stated that the Special Committee ***"identified weaknesses in the Company's compliance program and recommended several improvements, including the addition of resources for compliance and internal audit functions and enhanced training" which were adopted by the Board*** (emphasis added).

77. It also stated that the Board accepted the resignation of two senior managers, who are believed to be Yunjie Liu and Jean Xiaohong Kong ("Kong"), on August 15, 2019. Liu and ***Kong, who was also a director of the Company***, both failed to notify the full Board of Wang's arrest on or about January 16, 2019. During that period, the Company's operations were managed by other members of the Company's management team. The Press Release stated that Mr. Bin Liu, the current acting CEO, was appointed to replace Wang, who still remained under arrest. In fact, the Press Release noted that the Special Committee's investigation was constrained to some extent by "the lack of direct access to Mr. Wang," among other reasons.

## I. The December 31, 2019 Beijing First Intermediate People's Court's Judgment

78. The BFSMC signed a supplementary agreement, effective February 27, 2015, transferring all of its rights with respect to Building 7 in the 2014 Sale/Leaseback Deal to its subsidiary, Shixin Hengtai (the "Supplementary Agreement"). In 2017, Shixin Hengtai and ChinaCache Xin Run filed claims against each other in the Beijing First Intermediate People's Court Run regarding Building 7. Shixin Hengtai moved to have the 2014 Cooperation Agreement with ChinaCache Xin Run regarding the sale of Building 7 declared void, arguing that Wang, Gao, Xiao Liguo (the former legal representative of Shixin Hengtai), and an intermediary, were all under criminal investigation in connection with the 2014 Sale/Leaseback Deal:

> 1. The Seventh Inspection Group of the Municipal Committee, in their "Feedback and Opinion on the Inspection of the BFSMC Party Committee," [discussing] high-risk investment projects, clearly state, in part: "ChinaCache Data Center Real Estate Equity Project. ***When the BFSMC invested CNY 970 million to buy this project***, it did not make a clear [business] case, investment valuation, or risk analysis. [We] understand that the construction of this project cost CNY 469 million."
>
> 2. ***The former Party secretary and secretary-general of the BFSMC, Gao Shouliang; the former legal representative of Shixin Hengtai, Xiao Liguo; the former legal representative of ChinaCache Xinrun, Wang Song; and the intermediary in the contract are all under criminal investigation. [Their cases] have not yet been resolved. The parties on both sides, in the process of signing the "Cooperation Agreement" and the "Transaction Funding Escrow Account Agreement," engaged in malicious conspiracy,***

***harmed the state, and promoted special interests. [Therefore] the relevant contract should be declared void.***

79. On December 31, 2019, the Beijing First Intermediate People's Court ruled that the 2014 Cooperation Agreement, signed by Wang and Gao, and the Supplemental Agreement, were null and void. The court stated (emphasis added): ***"Investigation has found that the parties signing the Cooperation Agreement, Supplementary Agreement [and certain other agreements] engaged in malicious collusion and harmed collective interests, and [the contracts] should be declared void."***

## III. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### 2015 Statements

80. The Class Period begins on April 10, 2015, when ChinaCache filed its Annual Report on Form 20-F with the SEC, signed by Defendant Wang, reporting the Company's financial and operating results for the fiscal year ended December 31, 2014 (the "2014 20-F"). For 2014, Defendants reported a net loss of $1.11 million, or $0.04 per diluted share, on net revenue of $224.68 million, compared to a net loss of $5.57 million, or $0.25 per diluted share, on net revenue of $179.46 million in 2013.

81. The 2014 20-F also stated that ChinaCache is subject to both Chinese and U.S. anti-corruption laws, including the U.S. Foreign Corrupt Practices Act

("FCPA") (emphasis added): "We are subject to the U.S. Foreign Corrupt Practices Act, or the FCPA, which generally prohibits companies and anyone acting on their behalf from offering or making improper payments or providing benefits to foreign officials for the purpose of obtaining or keeping business, along with various other anti-corruption laws, ***including China's anti-corruption laws***.

82. The 2014 20-F touted the Company's "policies prohibit[ing] any such conduct" and asserted that the Company "require[d] that we, our employees and intermediaries comply with the FCPA and other anti-corruption laws to which we are subject."

83. Additionally, the 2014 20-F contained merely generic, boilerplate representations concerning the risk that Defendants might nonetheless violate anti-corruption laws because: (i) there was "no assurance that such policies or procedures [would] work effectively all the time" or would "protect [Defendants] against liability under the FCPA or other anti-corruption laws for actions taken by [Defendants'] employees and intermediaries" with respect to Defendants' current or acquired businesses; and (ii) Defendants "operate in the content and application delivery services industry in China[,]" transacting with "state or government-owned telecommunications carriers" and government agencies, which created an "elevated risk" of violating anti-corruption laws.

84. The 2014 20-F also contained merely generic, boilerplate representations to the effect that, should a government agency find that Defendants violated anti-corruption laws, they could "be subject to criminal and civil penalties and other remedial measures, which could have an adverse impact on [ChinaCache's] business, financial condition and results of operations[,]" as well as an adverse impact the Company's reputation, which could "cause [Defendants] to lose customer sales and access to end-user access networks, and lead to other adverse impacts on [ChinaCache's] business, financial condition and results of operations."

85. The 2014 20-F also stated:

> As of the date of this annual report, we have entered into agreements with two clients relating to ChinaCache Atecsys International Data Center, or Atecsys, a cloud data center to be developed in the aforesaid area. The first phase of construction is expected to be completed by December 2015 for the first batch of purchasers, including *people.cn* and Beijing Federation of Supply and Marketing Cooperatives, or BFSMC. Pursuant to the agreements, they agree to purchase part of the cloud infrastructure from us. Under our arrangement with BFSMC, Beijing Blue I.T. will lease back the property to be sold to BFSMC upon the completion of the transfer. The final sales agreement will be entered into after the requisite governmental approvals are obtained.

86. The 2014 20-F further stated:

> In December 2014, we entered into agreements with BFSMC, pursuant to which we agreed to sell to BFSMC one of the data center buildings. . . . It is expected that the sale of such building will be completed by December 2015. We also agreed to lease back the building from a subsidiary of BFSMC holding the building upon the completion of the transfer. . . . The final sales

> agreement for both the BFSMC and *people.cn* transfer will be entered into after the requisite governmental approvals are obtained. Construction of the two data centers started in Jun 2014 and we expect to complete the *people.cn* data center and the BFSMC data center by December 2015.

87. Appended as exhibits to the 2014 20-F were signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Wang and An certified that they: (a) reviewed the 2014 20-F, and based on their knowledge, the 2014 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…;" and "the financial statements, and other financial information included in [the 2014 20-F], fairly present in all material respects the financial condition, results of operations and cash flows of the company…;" (b) "disclosed…to the company's auditors and the audit committee...[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."

88. The statements referenced in ¶¶ 80-87 were materially false and misleading because Defendants failed to disclose that: (i) ChinaCache and Wang bribed/were bribing a government official in connection with the 2014 Sales/Leaseback Deal between ChinaCache and the BFSMC with respect to the buildings at the Internet Data Center; (ii) the foregoing conduct placed ChinaCache

and Wang at a heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations. This resulted in the criminal investigations of both Wang and the Company, the arrest of Wang, and criminal indictment of the Company for bribery; and (iii) the bribes caused the Company to be incapable of producing accurate financial statements.

**2016 Statements**

89. On April 27, 2016, ChinaCache filed its Annual Report on Form 20-F with the SEC, signed by Defendant Wang, reporting the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 20-F"). For 2015, Defendants reported a net loss of $14.12 million, or $0.56 per diluted share, on net revenue of $215.42 million, compared to a net loss of $1.11 million, or $0.04 per diluted share, on net revenue of $224.68 million in 2014.

90. Additionally, the 2015 20-F contained statements identical to those quoted in ¶¶ 81-84 above, touting ChinaCache's purported anti-corruption policies while providing merely generic, boilerplate representations that the Company could face severe penalties for violating anti-corruption laws.

91. The 2015 20-F stated (emphasis added):

> In March 2013, we acquired land use right in Tianzhu Comprehensive Bonded Zone in Beijing, upon which we plan to partner with our clients to construct cloud infrastructure. ***We have entered into agreements with two***

> ***clients, pursuant to which they agreed to purchase part of the cloud infrastructure from us.*** The final sales agreements with *people.cn* will be entered into after the requisite governmental approvals are obtained and the turnover of the building to BFSMC is also subject to such requisite governmental approvals.

92. The 2015 20-F further stated (emphasis added):

> ***In December 2014, we entered into agreements with BFSMC, pursuant to which we agreed to sell to BFSMC one of the data center buildings. . . . Under our agreements with BFSMC, we agree to turn over the subject building by September 2015. In addition, we also agreed to lease back the building from a subsidiary of BFSMC holding the building upon the completion of the transfer***. The construction of such building, however, has not yet been completed as of the date of this annual report.

93. Appended as exhibits to the 2015 20-F were signed certifications pursuant to Section 302 of SOX wherein Defendants Wang and An certified that they: (a) reviewed the 2015 20-F, and based on their knowledge, the 2015 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…;" and "the financial statements, and other financial information included in [the 2015 20-F], fairly present in all material respects the financial condition, results of operations and cash flows of the company…." and (b) "disclosed…to the company's auditors and the audit committee…[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."

94. The statements referenced in ¶¶ 89-93 were materially false and misleading because Defendants failed to disclose that: (i) ChinaCache and Wang bribed/were bribing a government official in connection with the 2014 Sales/Leaseback Deal between ChinaCache and the BFSMC with respect to the buildings at the Internet Data Center; (ii) the foregoing conduct placed ChinaCache and Wang at a heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations. This resulted in the criminal investigations of both Wang and the Company, the arrest of Wang, and criminal indictment of the Company for bribery; and (iii) the bribes caused the Company to be incapable of producing accurate financial statements.

**2017 Statements**

95. On November 14, 2017, ChinaCache filed its Annual Report on Form 20-F with the SEC, signed by Defendant Wang, reporting the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 20-F"). For 2016, Defendants reported a net loss of $137.56 million, or $5.39 per diluted share, on net revenue of $158.76 million, compared to a net loss of $14.12 million, or $0.56 per diluted share, on net revenue of $215.42 million in 2015.

96. Additionally, the 2016 20-F contained statements identical to those quoted in ¶¶ 81-84 above, touting ChinaCache's purported anti-corruption policies

while providing merely generic, boilerplate representations that the Company could face severe penalties for violating anti-corruption laws.

97. The 2016 20-F also stated the following in two places therein:

> In December 2014, we entered into agreements with BFSMC, pursuant to which we agreed to sell to BFSMC one of the data center buildings. . . . Under our framework agreement with BFSMC, we agreed to sell two buildings to a subsidiary of BFSMC through transferring the equity interest of our subsidiary Beijing Zhao Du, the owner of the buildings. In addition, we agreed to lease back the buildings from the subsidiary of BFSMC starting from an agreed earlier date. We also reached a supplemental company letter with BFSMC, pursuant to which we agreed that September 30, 2015 should be deemed as the date of delivery as long as we complete the actual delivery of the buildings as well as the equity transfer by December 31, 2016. If the equity transfer and other agreed procedures are completed on time, our liabilities shall be deemed fully discharged. However, BFSMC has not accepted the buildings by December 31, 2016 due to our disagreement with BFSMC on the standard of delivery and acceptance of the buildings. Therefore, we re-negotiated with BFSMC and reached a series of new agreements with BFSMC in July 2017. Pursuant to the new agreements, BFSMC agreed to make the payments of RMB105.6 million (US$15.2 million) to us immediately upon the completion of equity transfer of Beijing Zhao Du. Although we have completed the transfer of the equity interest in Beijing Zhao Du and the ownership of the buildings in July 2017, BFSMC failed to make the payments of RMB105.6 million (US$15.2 million) to us as agreed.

98. Appended as exhibits to the 2016 20-F were signed certifications pursuant to Section 302 of SOX wherein Defendants Wang and Fengye certified that they: (a) reviewed the 2016 20-F, and based on their knowledge, the 2016 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances

under which such statements were made, not misleading…;" and "the financial statements, and other financial information included in [the 2016 20-F], fairly present in all material respects the financial condition, results of operations and cash flows of the company…;" and (b) "disclosed…to the company's auditors and the audit committee…[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."

99. The statements referenced in ¶¶ 95-98 were materially false and misleading because Defendants failed to disclose that: (i) ChinaCache and Wang bribed a government official in connection with the 2014 Sales/Leaseback Deal between ChinaCache and the BFSMC with respect to the buildings at the Internet Data Center; (ii) the foregoing conduct placed ChinaCache and Wang at a heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations. This resulted in the criminal investigations of both Wang and the Company, the arrest of Wang, and criminal indictment of the Company for bribery; and (iii) the bribes caused the Company to be incapable of producing accurate financial statements.

**2018 Statements**

100. On April 27, 2018, the Company filed a Form 6-K with the SEC, signed by Defendant Wang, with an attached press release entitled *ChinaCache*

*Terminated Agreement to Sell Data Center Assets*. The press release stated that ChinaCache terminated an agreement to sell 79% of the Company's equity interest in Xin Run, which owns and operates the Company's Internet Data Center business, to three companies, two of which were controlled by Wang.

101. According to the press release (emphasis added), "[t]he Company's strategic decision to terminate the agreement was made in recognition of the perceived value of the assets in light of ***increasing market demand for Internet data center services*** and the belief that Xin Run can effectively be leveraged as part of the Company's offering package to customers." Defendant Wang stated (emphasis added): "China is rapidly adopting a digital lifestyle and Cloud and new data-intensive technologies, such as AI and big data analytics, are fanning demand for increasing Internet data center capacity and related services."

> ***With ten Internet data centers in Beijing hosting capacity for 12,400 racks, Xin Run is growing quickly and capturing wide-spread demand from government agencies*** and businesses, including several leading Internet and Cloud service enterprises. Against this backdrop, we see a compelling value proposition as we offer customers total solution services, comprised of our Internet data centers, Internet and Cloud exchange centers and our extensive content delivery network. We believe this three-layered structured network will provide an integrated and broad-base of operations from which we can capitalize on our strengths and deliver sustained shareholder value.

102. On April 30, 2018, ChinaCache filed its Annual Report on Form 20-F with the SEC, signed by Defendant Wang, reporting the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 20-F").

For 2017, Defendants reported a net loss of $54.69 million, or $2.06 per diluted share, on net revenue of $126.31 million, compared to a net loss of $137.56 million, or $5.39 per diluted share, on net revenue of $158.76 million in 2016.

103. The 2017 20-F contained statements nearly identical to those quoted in ¶ 101 above (emphasis added):

> China is rapidly adopting a digital lifestyle and Cloud and new data-intensive technologies, such as AI and big data analytics, are fanning demand for increasing Internet data center capacity and related services. ***With ten internet data centers in Beijing hosting capacity for 12,400 racks, a catalyst for the Company to offer enhance packaged CDN/IDC product services, Xin Run is growing quickly and capturing wide-spread demand from government agencies*** and businesses, including several leading Internet and Cloud service enterprises. Against this backdrop, we see a compelling value proposition as we offer customers total solution services, comprised of our Internet data centers, Cloud hosting and Internet exchange centers and our extensive content delivery network. We believe this three-layered structured network will provide an integrated and broad-base of operations from which we can capitalize on our strengths and deliver sustained shareholder value.

104. Additionally, the 2017 20-F contained statements substantively identical to those quoted in ¶¶ 81-84 above, touting ChinaCache's purported anti-corruption policies while providing merely generic, boilerplate representations that the Company could face severe penalties for violating anti-corruption laws. The 2017 20-F went further, however, than statements in the Company's prior annual reports, and represented that "company policies ***strictly*** prohibit" (emphasis

added), as opposed to merely prohibit, any conduct that violates anti-corruption laws.

105. The 2017 20-F also contained statements nearly identical to those quoted in ¶ 97 above:

> Under our agreement with BFSMC, we agreed to sell two buildings to a subsidiary of BFSMC through transferring the equity interest of our subsidiary Beijing Zhao Du, the owner of the buildings. In addition, we agreed to lease back the buildings from the subsidiary of BFSMC starting from an agreed earlier date. We also reached a supplemental company letter with BFSMC, pursuant to which we agreed that September 30, 2015 should be deemed as the date of delivery as long as we complete the actual delivery of the buildings as well as the equity transfer by December 31, 2016. If the equity transfer and other agreed procedures are completed on time, our liabilities shall be deemed fully discharged. However, BFSMC has not accepted the buildings by December 31, 2016 due to our disagreement with BFSMC on the standard of delivery and acceptance of the buildings. Therefore, we re-negotiated with BFSMC and reached a series of new agreements with BFSMC in July 2017. Pursuant to the new agreements, BFSMC agreed to make the payments of RMB105.6 million to us immediately upon the completion of equity transfer of Beijing Zhao Du. Although we have completed the transfer of the equity interest in Beijing Zhao Du and the ownership of the buildings in July 2017, BFSMC failed to make the payments of RMB105.6 million to us as agreed.

106. Appended as exhibits to the 2017 20-F were signed certifications pursuant to Section 302 of SOX wherein Defendants Wang and Meng certified that they: (a) reviewed the 2017 20-F, and based on their knowledge, the 2017 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading…[;]" and "the financial

statements, and other financial information included in [the 2017 20-F], fairly present in all material respects the financial condition, results of operations and cash flows of the company. . . [;]" and (b) "disclosed . . . to the company's auditors and the audit committee … [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting."

107. The statements referenced in ¶¶ 100-106 were materially false and misleading because Defendants failed to disclose that: (i) ChinaCache and Wang bribed a government official in connection with the 2014 Sales/Leaseback Deal between ChinaCache and the BFSMC with respect to the buildings at the Internet Data Center; (ii) the foregoing conduct placed ChinaCache and Wang at a heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations. This resulted in the criminal investigations of both Wang and the Company, the arrest of Wang, and criminal indictment of the Company for bribery; (iii) the demand from government agencies, such as the BFSMC, was the result of bribes; and (iv) the bribes caused the Company to be incapable of producing accurate financial statements.

**2019 Statements**

108. On April 11, 2019, ChinaCache filed a Form 6-K with the SEC (the "April 2019 6-K"), reporting that, on April 8, 2019, Grant Thornton China, the China member firm of Grant Thornton International, Ltd., had resigned as ChinaCache's auditor, and that the Company had engaged Studer as the Company's auditor on April 10, 2019. Specifically, the April 2019 6-K stated, in relevant part:

> On April 8, 2019, Grant Thornton China ("GT"), the China member firm of Grant Thornton International, Ltd., resigned as ChinaCache International Holdings Ltd. (the "Company")'s independent registered public accounting firm. Since the commencement of GT's engagement in December 2018 through April 4, 2019, there were no disagreements with GT on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which, if not resolved to GT's satisfaction would have caused GT to make reference to the subject matter of the disagreement(s) in connection with its audit report. GT has not issued any report on the consolidated financial statements of the Company for any prior fiscal year.

109. The statements referenced in ¶ 108 were materially false and misleading because Defendants failed to disclose that: (i) Grant Thornton China resigned for reasons related to the bribery scandal. Grant Thornton China likely discovered that (a) Wang was arrested for enterprise bribery in January 2019, and since that time, the Company's operations were managed by other members of the Company's management team; and (b) the bribes caused the Company to be incapable of producing accurate financial statements; and (ii) the bribes and Grant

Thornton's resignation placed ChinaCache at heightened risk that the Company would be delisted by NASDAQ. Moreover, the statements referenced above were false and misleading because Defendants failed to disclose that Wang had been arrested in January 2019 for enterprise bribery and that the Company's operations were being run by other members of ChinaCache's management team.

## IV. THE TRUTH BEGINS TO EMERGE

110. On May 17, 2019, ChinaCache announced that Wang and the Company were under criminal investigation by a government prosecutor office in Beijing for allegations of enterprise bribery, and that Wang was arrested and resigned as CEO. Specifically, the press release stated, in relevant part:

> The Company has received a notice from a government prosecutors' office in Beijing that the Company is currently under investigation for allegations of enterprise bribery. The Company has engaged a criminal defense counsel to prepare for the relevant legal proceedings. As the legal proceedings are still at a relatively early stage, the Company is currently unable to assess the likely outcomes of such proceedings.
>
> Mr. Song Wang has been arrested and is also currently under investigation for the allegations of enterprise bribery against the Company. Mr. Song Wang has tendered his resignation as the Company's Chief Executive Officer to the Board.

111. The news of the bribery scandal caused the stock to drop. On this news, ChinaCache's ADR price fell $0.22 per share, or 20%, to $0.88 per share on May 17, 2019 before NASDAQ halted trading in ChinaCache ADRs at 11:12 a.m.

Eastern Time. NASDAQ announced that trading was halted on ChinaCache securities for "additional information" requested from the Company and that "[t]rading will remain halted until ChinaCache International Holdings Ltd. has fully satisfied Nasdaq's request for additional information." The Company's statements in the May 17, 2019 press release were nevertheless false and misleading because the Company failed to disclose that Wang had been arrested as early as January 2019.

112. On September 6, 2019, ChinaCache's ADRs began to trade in the OTC market instead of on the NASDAQ. Since trading had previously been halted on the NASDAQ less than two hours after the Company's May 17, 2020 press release, the market continued to react to the press release. Additionally, the market was reacting to the events that occurred since trading was halted, including the May 23, 2019 NASDAQ letter; the May 31, 2019 announcement that that the Company fired its auditor who had just recently replaced Grant Thornton China; and the Company's June 6, 2019 announcement that Wang resigned from the Board. The news that the Company's ADRs were trading in the OTC market instead of on the NASDAQ also signaled to the market that the temporary stay of delisting from the NASDAQ announced by the Company in its August 5, 2019 press release, was likely lifted.

113. On this news, the Company's ADR price fell $0.48 per share, or approximately 55%, to close at $.40 per share on September 6, 2019.

114. On September 9, 2019, the Company filed a Form 6-K with the SEC in which ChinaCache announced final delisting from the NASDAQ. The filing stated that on September 4, 2019, the Company was informed by NASDAQ of the final decision by The NASDAQ Hearings Panel to delist the Company's shares from the NASDAQ. The delisting determination stated that NASDAQ would complete the delisting with the SEC after applicable appeal periods had elapsed. The filing further stated that the Company did not intend to appeal the decision.

115. On this news, ChinaCache's ADRs became almost worthless, falling $0.36 per share over a three-day period, or 90%, to close at $0.04 per share on September 11, 2019.

116. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## V. ADDITIONAL SCIENTER ALLEGATIONS

### A. With the Entry of Large Competitors in the CDN Business, the Internet Data Center Business Became Critically Important for ChinaCache

117. ChinaCache's June 2014 Investor Presentation showed that in 2012, ChinaCache had a 50% market share in China's CDN market, citing iReseach's

2012 China CDN Industry Research Report. However, the Company's dominant market share would be short-lived.

118. In March 2014, Alibaba Cloud Computing (AliCloud), a subsidiary of Chinese e-commerce conglomerate Alibaba Group, announced the opening of its CDN services for commercial operation, making the services available to enterprise clients both in China and overseas.

119. The entry of such a large competitor meant a potential large loss of CDN market share for ChinaCache. In an effort to stay competitive, ChinaCache embarked on the creation of the Internet Data Center with the BFSMC in December 2014. To pay for the construction of the Internet Data Center buildings to be sold to the BFSMC, ChinaCache utilized the funds prepaid by the BFSMC.

120. In March 2015, Tencent Holdings Limited ("Tencent"), a provider of internet value added services in China, launched Tencent Cloud CDN.

121. On April 1, 2015, one ChinaCache analyst reported: "Tencent announced last week that they will offer CDN services, after Alibaba (BABA) entered the market earlier this year." "We think Tencent's and Alibaba's (BABA) entrance into the CDN market creates some concern over the market's competitive landscape for the long-run."

122. ChinaCache's 2014 20-F also discussed the Company's competition: "In China, we primarily compete with domestic content and application delivery

service providers. Our primary domestic competitors include ChinaNetCenter, Dnion Technology, and 21Vianet which acquired FastWeb in 2012. In early 2014, Alibaba also announced the launch of AliCloud CDN commercial services to offer third-party CDN services. In March 2015, Tencent announced its launch of TencentCloud CDN."

123. Large companies, such as Alibaba and Tencent, were hot on ChinaCache's trail to capture its CDN market. The 2014 20-F also stated: "Some of our current or potential competitors may have greater financial, marketing and other resources than we do and may have stronger governmental support." As a result, ChinaCache's IDC services and its Internet Data Center became critically important to the Company.

124. On December 1, 2016, ChinaCache filed a Form 6-K with the SEC with an attached November 29, 2016 press release. The press release noted Wang's comments:

> As we turn the corner to 2017, our goal is to regain market share and emerge as the leading CDN provider in China. To enhance our competitive position within the CDN industry, we are transforming ourselves from a pure CDN provider to a one-stop-shop total solutions provider. Focusing on content and applications, we believe our new three-layer structured network consisting of the IDCs, Internet and cloud exchange centers and extensive CDN nodes will emerge as one of the best business models in the Chinese CDN industry and deliver superior value to our customers. We are in the process of deployment and are ready to expand services.

### B. ChinaCache and its Subsidiaries Have Bribed Others, Including a Second Government Official

125. ChinaCache and its subsidiaries have bribed other individuals, including a second government official. According to a December 26, 2019 judgment issued by the Beijing Second Intermediate People's Court, on January 7, 2014, Fang Nan ("Fang"), the former head of the Mobile Network Administration Department of Cyberspace Administration of China, "abused his position as [a] responsible person for a certain work unit. In exchange for his helping [Beijing Blue, the ChinaCache company owned by Wang and his wife] to secure the continuation of a server colocation contract, he received a bank card loaded with 600,000 yuan from Chen X, a senior director at [ChinaCache Xin Run,]" ChinaCache's subsidiary that operates the Company's Internet Data Center business. Fang "then used the money on the card to purchase automobiles and real estate."

126. As per a now deleted April 1, 2020 article published by 21 Century Economics, Fang was first apprehended by the Beijing Fengtai District Supervisory Committee on May 28, 2019, just 11 days after ChinaCache's May 17, 2019 press release regarding the criminal investigation of Wang and ChinaCache, Wang's arrest, and his resignation.

127. The Beijing Second Intermediate People's Court ultimately found Fang guilty of receiving bribes worth a total of CNY 1,389,000 (USD 196,000), and sentenced him to three years in prison and a fine of CNY 200,000 (USD 28,000).

128. On November 12, 2019, the Company filed a Form 6-K with the SEC with an attached press release stating that the Company's wholly-owned subsidiary, ChinaCache Network Technology (Beijin) Co., Limited ("ChinaCache Network"), had been fined RMB 900,000 by the Tangyin County People's Court of Henan Province for its "company bribery." ChinaCache Network paid the fine.

129. Beijing First Intermediate People's Court records show ChinaCache Xin Run, the ChinaCache subsidiary that operates the Internet Data Center, was also criminally charged with "Bribing of Work Units." Although very little has been disclosed, the case was "first heard in 2019."

## VI. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

130. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ChinaCache ADRs during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

131. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ChinaCache securities were actively traded. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ChinaCache or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

132. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

133. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

134. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of ChinaCache;
- whether the Individual Defendants caused ChinaCache to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of ChinaCache securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

135. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

136. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- ChinaCache ADRs are traded in an efficient market;
- the Company's ADRs were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and OTC, and was covered by analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Lead Plaintiff and members of the Class purchased, acquired and/or sold ChinaCache ADRs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

137. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

138. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

139. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

140. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

141. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ChinaCache securities; and (iii) cause Lead Plaintiff and other members of the Class to

purchase or otherwise acquire ChinaCache ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

142. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ChinaCache ADRs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose the bribes to Gao and that the Company was at a heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations.

143. By virtue of their positions at ChinaCache, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and

omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

144. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As senior officers and/or directors of ChinaCache, the Individual Defendants had knowledge of the details of ChinaCache's internal affairs.

145. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ChinaCache. As senior officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ChinaCache's businesses, operations, and financial condition. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of ChinaCache ADRs was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the bribes to Gao and the heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations, Lead Plaintiff and the other members of the Class purchased or

otherwise acquired ChinaCache ADRs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

146. During the Class Period, ChinaCache ADRs were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired ChinaCache ADRs at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of ChinaCache ADRs was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of ChinaCache ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

147. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

148. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure of the truth to the investing public.

## COUNT II

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

149. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

150. During the Class Period, the Individual Defendants participated in the operation and management of ChinaCache, and conducted and participated, directly and indirectly, in the conduct of ChinaCache's business affairs. Because of their senior positions, they knew about the bribes to Gao and the heightened risk of criminal investigation and enforcement action by government authorities, which would foreseeably disrupt the Company's operations.

151. As senior officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ChinaCache's businesses, financial condition and results of operations, and to correct promptly any public statements issued by ChinaCache which had become materially false or misleading.

152. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ChinaCache disseminated in the marketplace during the Class Period concerning ChinaCache's businesses, financial condition and results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ChinaCache to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ChinaCache within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ChinaCache ADRs.

153. Each of the Individual Defendants, therefore, acted as a controlling person of ChinaCache. By reason of their senior positions as officers and/or directors of ChinaCache, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ChinaCache to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of ChinaCache and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

154. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ChinaCache.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated: July 9, 2020

Respectfully submitted,

**POMERANTZ LLP**

/s/ Brenda Szydlo
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 917-463-1044
Email: jalieberman@pomlaw.com
Email: bszydlo@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-377-1184
Email: pdahlstrom@pomlaw.com

*Counsel for Lead Plaintiff and the Proposed Class*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

Email: lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Jing Chen
275 Madison Avenue, 40th Fl.
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jchen@rosenlegal.com

*Additional Counsel for Lead Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/Brenda Szydlo*
Brenda Szydlo